UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

AVON WHOLESALE SUPPLY, INC.                    :

vs.                                            :

MONMOUTH REALTY COMPANY,                        *CA 04-30227-KPN*
B.D. NIMS LUMBER COMPANY,
RICHARD F. NIMS and LOIS NIMS                  : NOVEMBER 18, 2004

## COMPLAINT

The Plaintiff hereby brings its Complaint as set forth hereinbelow by its undersigned

counsel.

### PARTIES

1. The plaintiff, Avon Wholesale Supply, Inc. ("Avon Wholesale"), is a Connecticut

corporation with a principal place of business located at 1790 Farmington Avenue,

Unionville Connecticut which, in 1998, purchased certain property located at 253 Baldwin

Street, West Springfield, Massachusetts.

2. The defendant Monmouth Realty Company ("Monmouth") was, at certain times

material herein, registered as an "active" corporation with the Secretary of State of the

Commonwealth of Massachusetts; and, on information and belief, may still be so registered

as of the date of this Complaint.

3. The defendant B. D. Nims Lumber Company ("B.D. Nims") was, at certain times

material herein, registered as an "active" corporation with the Secretary of State of the

C/F/CL
LR 41
SI.

Commonwealth of Massachusetts.

4. The defendant, Richard F. Nims ("Nims") is a resident and domiciliary of the City of West Springfield, in the Commonwealth of Massachusetts and is or was formerly a shareholder, officer and director of a Massachusetts Corporation known as Monmouth Realty Company ("Monmouth") which had and/or has a registered principal place of business at 253 Baldwin Street in the City of West Springfield, Massachusetts.

5. Said Defendant Nims was also, at certain times material herein, a shareholder, officer and director of Defendant B. D. Nims Lumber Company.

6. The defendant, Lois Nims ("Lois Nims") is, on information and belief, the Wife of Defendant Nims and was at certain times material herein a shareholder, director and officer of Monmouth.

7. The Defendant Lois Nims was also, at certain times material herein, a shareholder, officer and director of Defendant B. D. Nims Lumber Company.

## JURISDICTION AND VENUE

8. Jurisdiction in this Court is founded on diversity of citizenship and an amount in controversy in excess of Seventy-five Thousand ($75,000.00) dollars.

9. Venue is proper in this District inasmuch as all of the acts and omissions complained of herein occurred in this District.

## FACTUAL BACKGROUND

10. On or around August 19 and 22, 1997, Avon Wholesale entered into a Purchase and Sale Agreement with Monmouth Realty Company ("Monmouth") for the conveyance of Lot 1 at 253 Baldwin Street, West Springfield, Massachusetts ("Lot 1"). A true and correct copy of that Purchase and Sale Agreement is attached hereto as Exhibit "A" and is incorporated

2

herein.

11. As part of said Agreement, Defendant Monmouth agreed to indemnify Buyer for and hold it harmless from any environmentally-related damages or loss of any kind "arising out of any Hazardous Materials released at the Premises up to the date of closing." The operative language is contained on page 6 of the agreement, paragraph 12 f:

> Hazardous Waste. The obligations of the BUYER hereunder are con-
> tingent upon its receipt of a Phase I - Initial Site Investigation Report (the
> "Phase I Report") to be prepared, at BUYER'S cost, within ninety (90) days
> of the date that the BUYER has actual notice of completed execution of this
> Agreement, for BUYER'S determination of the presence, possible presence, or
> absence of Hazardous Materials, petroleum or asbestos contamination on the
> premises and which may or may not include initial subsurface investigation.

The Agreement also provided that Seller's agreement to indemnify would survive the closing on the Property.

12. Following execution of the Purchase and Sales Agreement - and as provided for in said Agreement - certain environmental tests were performed and it was determined that there were certain reportable environmental problems at the Property.

13. On February 25, 1998, The Massachusetts Department of Environmental Protection ("MADEP") sent a "NOTICE OF RESPONSIBILITY" to Monmouth in which it indicated that "the property, or portions thereof, is a disposal site which requires a response action." A copy of that letter of notice is attached hereto as Exhibit C.

14. On or around April 27, 1998, Avon Wholesale and Monmouth entered into an Escrow and Indemnity Agreement regarding the environmental conditions of the Property and the remediation of hazardous materials at the Property. A true and correct copy of that Escrow and Indemnity Agreement Re: Environmental Conditions is attached hereto as Exhibit D and is incorporated herein. That Agreement specifically referred to the definition contained in the Purchase and Sale Agreement (see paragraph 12 f thereof, set forth in

paragraph 11, above). It also specifically mentioned (sixth Recital, page 2) that "The Buyers' inspections of the Premises disclosed a detected release of gasoline upon the Premises (hereinafter "UST Release") as described in a report of Environmental Risk Limited dated February 24, 1998 . . . "

15. The Escrow and Indemnity Agreement provided that Monmouth would deliver $150,000.00 to the Escrow Agent for environmental work, including without limitation investigation, testing, and remediation of the Property.

16. The Escrow and Indemnity Agreement further provided that Monmouth would indemnify Avon Wholesale for any such environmental work which exceeded the $150,000.00 placed in escrow.

17. By deed dated May 22, 1998, Monmouth conveyed Lot 1 to Avon Wholesale. A true and correct copy of that deed is attached hereto as Exhibit E and is incorporated herein.

18. Prior to the conveyance by Monmouth to the plaintiff, the Department of Environmental Protection of the Commonwealth of Massachusetts ("MADEP") – by letter dated February 25, 1998, a copy of which is attached hereto as Exhibit F - had notified Monmouth that it was considered to be the "responsible party" for environmental clean-up of the subject site at 253 Baldwin Street, West Springfield pursuant to Chapter 21E of the Massachusetts.

19. In August of 1997, the Plaintiff retained Environmental Risk Limited ("ERL") of Bloomfield, Connecticut as its environmental consultant in order to perform a Buyer's environmental investigation and then, at the direction of the Seller, to perform further testing and remediation as set forth in the Escrow and Indemnity Agreement referred to in paragraph 14.

4

20.    On or about July 2, 1998, Monmouth, as the "former owner" and " person undertaking RAM" - "RAM" being a "release abatement measure" pursuant to 310 CMR 40.0444 et seq - submitted on a MADEP "BWSC-106" form (Exhibit G, attached) a "Release and Utility-Related Abatement Measure (RAM & URAM) Transmittal Form ("RAM") signed and attested to by Defendant Nims as President of Monmouth.

21.    As noted on Exhibit G, by signing the "Certification of Person Undertaking RAM or URAM" (paragraph M of Exhibit F), Defendant Nims did

> attest under the pains and penalties of perjury (i) that I have personally examined and am familiar with the information contained in this submittal, including any and all documents accompanying this transmittal form, (ii) that, based on my inquiry of those individuals responsible for obtaining the information, the material information contained in this submittal is, to the best of my knowledge and belief, true, accurate and complete, and (iii) that I am fully authorized to make this attestation on behalf of the entity legally responsible for possible fines and imprisonment, for willfully submitting false, inaccurate, or incomplete information.

22.    The RAM – Exhibit G – identified as the "source of the Release" (paragraph C) a "UST", or underground storage tank – in this case for gasoline and described in paragraph D therein – and identified in the "Description of Response Actions" a plan for "excavation of contaminated soils" by removing "gasoline contaminated soils".

23.    The RAM further mentions that groundwater as well as soil were found to be contaminated, and estimated that 170 cubic yards of soil would have to be removed in order to remediate.

24.    The concept developed by ERL and approved by Defendants Nims and Monmouth was essentially that the soil was retaining gasoline pollutants in much the way a sponge can absorb and retain water or other fluids, and that removing enough soil was an appropriate and sufficient initial remediation measure.

25. By letter dated July 13, 1998, MADEP informed Defendants Nims and Monmouth that it "approve[d] the RAM Plan as proposed". (A copy of that letter is attached as Exhibit H). The letter mentions that "[a]ppropriate soil and groundwater sampling will be conducted to determine the effectiveness of the RAM"; and required the responsible party to "advise the Department should the total quantity of soil removed exceed 300 cubic yards".

26. Defendant Nims was at all times kept closely informed of the progress and work being done in furtherance of the plan described in this initial RAM and of similar submissions which followed, including without limitation being sent substantially all the reports provided by ERL, all the communications between ERL and the Plaintiff, and all the communications between MADEP and the Plaintiff and MADEP and ERL.

27. Defendant Nims, on information and belief in order to become more familiar with the environmental clean-up, visited the subject property in or about the first week of August, 1998 to view the deep pit that had been created by excavation and removal of the huge amount of soil, which reeked of gasoline.

28. On information and belief, substantially all of the significant information with which Defendant Nims was supplied, as described, was shared by him with Defendant Lois Nims.

29. In the fall of 1998, it became evident that the extent - and possibly nature - of the environmental problems at the site were greater than had previously been thought.

30. Based on higher levels of contaminants than what had been expected after the initial soil removal, a very substantially greater amount of soil was removed than had originally been thought necessary.

31. On November 5, 1998, Avon Wholesale sent Nims a copy of a letter Avon had received from ERL dated November 3, 1998, in which significant new findings were

6

reported. (These letters are attached hereto as Exhibits I-1 and I-2, respectively.) Especially troubling was the report in the ERL letter of the fact that "[t]he mapping of the groundwater elevations on the property and sampling of the newest groundwater monitoring wells indicate that the contaminants are migrating in a northwesterly direction, opposite what was initially presumed by ERL and AES."

32. On December 4, 1998, after ERL had removed almost 400 tons of soil from the site, in the course of the groundwater monitoring which had been put in place due to concern with elevated levels of contaminates in the ground water post excavation and as required by MADEP, ERL discovered over two inches of free floating petroleum products in one of the newest wells, which was located farther from the excavation site than any of the other wells.

33. By letter of December 9, 1998, the Plaintiff sent to Defendants Nims and Monmouth a letter also dated December 9, 1998 from ERL to the Plaintiff's representative which reported the two inches of free floating petroleum and which contained other new, unanticipated and alarming information. The ERL letter said, among other things, that

> ERL recently installed several additional groundwater monitoring wells to the north of the excavation based on the results of ERL's initial groundwater elevation mapping. That mapping indicated that there was a potential that the contaminants were migrating in a northwesterly direction, opposite what was initially presumed by ERL and AES, creating the need for additional monitoring wells. The surveying and monitoring of these new wells has not conclusively clarified the direction of groundwater flow.   .   .   .   Also, during the most recent round of groundwater monitoring, over two inches of free floating petroleum products were detected in one of the newest wells (MW-10), which is located the farthest from the excavation in a northerly direction. Because of the complex groundwater flow pattern on the subject property ad the appearance of free-floating product in well MW-10, it appears that there may still be a source of petroleum contamination. (emphasis added).

Copies of these letters are attached hereto as Exhibits J-1 and J-2, respectively.

34. On February 10, 1999, the Plaintiff Avon Wholesale notified Defendant Nims that

> it is apparent that Monmouth Realty Company, or its shareholders, to the extent they have received distributions of Monmouth's assets, may need to indemnify us beyond the amount that has been escrowed in accordance with our written agreements. Letter dated February 10, 1999 – Exhibit K, attached.

Along with this letter, the Plaintiff also supplied Nims with a copy of ERL's report of that date in which it described the new approach being taken and gave a total projected cost of $173,022. (Copy attached as Exhibit L.) In addition, Avon very specifically inquired if Mr. Nims had knowledge of possible sources of contamination other than the underground storage tank which had been removed.

35. On December 31, 1998, Monmouth filed dissolution papers with the Massachusetts Secretary of State.

36. The corporate status of Monmouth was later revived by means of an application filed with the Secretary of State, dated July 19, 2000, in which Defendant Nims as President of Monmouth states that

> The corporation had sold all of its business assets and had made a partial distribution to its shareholders. Final distributions were scheduled to be made after final tax returns had been prepared, tax liabilities determine and paid, and dissolution expenses accounted for. During the time that final matters were being completed, the corporation received notice of a possible claim against it arising out of environmental issues associated with real property previously owned by it. Application for Revival, Exhibit M, attached.

37. A second Application for Revival was filed on October 12, 2001, bearing a date of September 25, 2001. A copy of that Application is attached hereto as Exhibit N. It contains the same reasons for the application as those cited above, verbatim.

38. Between the dissolution of the corporation on December 31, 1998 and the first Application for Revival on July 19, 2000, Defendant Nims executed as "President" of

Monmouth and sent to MADEP for filing the following:

| Form No. | Name of Form | Date signed |
|---|---|---|
| BWSC-107A | Tier Classification, Tier II Extension and Tier II Transfer Transmittal Form | February 22, 1999 |
| BWSC-108 | Comprehensive Response Action Transmittal Form & Phase I Completion Statement | November 3, 1999 |
| BWSC-103 | Release Notification & Notification Retraction Form | April 19, 2000 |

Copies of these forms are attached hereto as Exhibits O-1, O-2 and O-3, respectively.

39.  The first of these forms contained on the signature page an attestation oath which was very similar to the one set forth in paragraph 24, above  - certifying that the person or entity on whose behalf the form was being submitted (here, Monmouth) - had the "technical, financial and legal ability to proceed with response actions", and that the author of the form (here, Nims) was aware of the "requirements   .    .    .    for notifying the Department in the event that [he] learns that the [entity- Monmouth] learns that it   .    .    is unable to proceed with the necessary response actions"

40.  Even as of the date of this Complaint, on Plaintiff's information and belief, neither Nims nor Monmouth has notified MADEP that Monmouth "is unable to proceed with the necessary response actions."

41.  Subsequent to the first Application for Revival of Monmouth on July 19, 2000, Defendant Nims executed as President of Monmouth and sent to MADEP for filing the following:

| Form No. | Name of Form | Date signed |
|---|---|---|
| BWSC-108 | Comprehensive Response Action Transmittal Form & Phase I Completion Statement | February 27, 2001 |

BWSC-105    Immediate Response Action (IRA)            July 12, 2001
            Transmittal Form

BWSC-105    Immediate Response Action (IRA)            December 22, 2001
            Transmittal Form


BWSC-108    Comprehensive Response Action Transmittal   April 3, 2002
            Form & Phase I Completion Statement

Copies of these forms are attached hereto as Exhibits P-1, P-2, P-3 and P-4, respectively.

42.  Each of these forms contained on the signature page an attestation oath which was very similar to the one set forth in paragraph 21, above.

## COUNT ONE: PRIVATE RIGHT OF ACTION AGAINST DEFENDANT MONMOUTH UNDER CHAPTER 21E OF THE MASSACHUSETTS GENERAL LAWS

1-42 Paragraphs 1 – 42 of this Complaint are hereby repeated and incorporated as like-numbered paragraphs of this Count One.


43.  Chapter 21E, Section 4A of the Massachusetts General Laws – which is entitled "Notification of response action taken by person other than department; procedure; civil action" – provides that, after notification as set forth in said section, a party claiming damages based on its being held responsible for an environmental clean-up may bring a civil action in accordance with the provisions of said Section.


44.  Pursuant to the provisions of Section 4A, the Plaintiff gave notice to Defendant Monmouth by letter dated January 29, 2003 of its intention to bring a civil action for damages based on the failure of Monmouth to complete the remediation of the environmental damages described above unless said Defendant responded in the manner set forth in Section 4A with a commitment to make a contribution to the required cleanup which

was satisfactory to Plaintiff. A copy of the initial notice is attached hereto as Exhibit Q.

45.    Notwithstanding said Notice - and three subsequent letters in which the Plaintiff referred to the specific statutory bases on which Plaintiff based its environmental law claims and set forth several related state-law causes of action - Defendant Monmouth has failed to offer any contribution to the damages Plaintiff will incur as a result of the failure of Monmouth, the "responsible party" notified by MADEP, to remediate the site.

46.  In its final letter to Monmouth, dated January 8, 2004 (copy attached as Exhibit  R), Plaintiff pointed out that Monmouth had made no offer of any sort to attempt to resolve the issues, had failed to negotiate in good faith, and that Plaintiff would seek reimbursement of attorneys' fees and costs if litigation were to ensue.

47.  Accordingly, Monmouth is liable to the Plaintiff for the expenditures it has incurred and will incur for the remediation required under the law by MADEP.

48.  In addition, as provided for in Section 4A(d) of Chapter 21E of the Massachusetts General Laws, Monmouth is liable to the Plaintiff for its litigation costs and reasonable attorneys' fees inasmuch as, knowing that its liability was reasonably clear, and having been provided notice as set forth above, Monmouth failed without a reasonable basis to participate appropriately in the response action or to agree to contribute an equitable amount to share of the costs of the response action, all as requested in writing by the Plaintiff.

## COUNT TWO – BREACH OF CONTRACT OF PURCHASE AND SALE BY DEFENDANT MONMOUTH

1 - 42.  Paragraphs 1 – 42 of Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Two.

43.  As set forth in paragraphs 10 and 11, above, Defendant Monmouth is contractually liable to the Plaintiff for the costs of environmental remediation which exceed the $150,000

escrow and for all related costs. Specifically, in the Purchase and Sale Agreement (Exhibit A), it is provided that:

> The SELLER agrees that in consideration of the willingness of the BUYER to purchase the Premises, the SELLER agrees to indemnify and hold the BUYER harmless from and against any demands, claims, damages, losses, obligations, liabilities, costs and expenses, including without limitation reasonable attorneys' fees and reasonable environmental consultants' fees, suffered or incurred by the BUYER as a result of or arising out of any Hazardous Materials released at the Premises up to the date of closing. The SELLER'S indemnification pursuant to this paragraph shall, however, survive closing.

44. Defendant Monmouth has failed and refused to pay such costs, fees and expenses and is therefore in breach of the contract of purchase and sale and is liable to the Plaintiff for such costs, fees and expenses and other consequential damages.

## COUNT THREE: BREACH OF ESCROW AND INDEMNITY AGREEMENT BY DEFENDANT MONMOUTH

1 - 42. Paragraphs 1 – 42 of Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Three.

43. As set forth in paragraphs 17 to 19, above, Defendant Monmouth is contractually liable to the Plaintiff for the costs of environmental remediation which exceed the $150,000 escrow and for all related costs by virtue of the terms of the Escrow and Indemnity Agreement alleged in said paragraphs and attached hereto as Exhibit D. Specifically, as contained in paragraph 9(b) of that Agreement:

> The SELLER agrees to indemnify and hold the BUYER harmless from and against any and all losses, costs, claims, obligations, damages, liability, payments, fines, penalties, causes of action, liens and expenses, including, without limitation, expense and reasonable consultants' fees and reasonable costs and expenses including reasonable attorneys' fees incurred in connection with the performance of the Remedial Work with respect to the Hazardous Materials in existence at the Premises as of the date of closing, arising out of or relating to any one or more of the following:

(i) The existence of any Hazardous Materials at the Premises as of the date of this Agreement;

(ii) The Governmental Requirements with respect to the removal, monitoring, testing or evaluation of any of the Hazardous Materials in existence at the Premises as of the date of closing; or

(iii) The failure of the Seller to perform or satisfy its obligations pursuant to this Agreement.

47. Defendant Monmouth has failed and refused to pay such costs, fees and expenses and is therefore in breach of the Escrow and Indemnity Agreement and is liable to the Plaintiff for such costs, fees and expenses and other consequential damages.

## COUNT FOUR: FRAUDULENT CONVEYANCE
## BY MONMOUTH TO DEFENDANTS NIMS AND LOIS NIMS

1-42. Paragraphs 1 through 42 of the Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Four.

43. As set forth in paragraphs 10 and 11, above, Defendant Monmouth is liable to the Plaintiff for the costs of environmental remediation which exceed the $150,000 escrow.

44. On December 31, 1998, Defendant Monmouth filed dissolution papers with the Massachusetts Secretary of State.

45. In conjunction with the filing of the dissolution papers, and subsequent to receiving substantial information from the Plaintiff and ERL during the last few months of 1998 (see paragraphs 32 - 36, above) on the basis of which it knew or should have known that the Plaintiff could easily have a claim against Monmouth for environmental expenses in excess of $150,000, Monmouth distributed to its shareholders Richard F. Nims and Lois Nims what is believed to have been a very significant portion of its net worth.

46. This distribution was made for the purpose of defrauding the Plaintiff and hindering

and preventing it from collection of amounts due it for assessment of costs of environmental clean-up in excess of $150,000 as provided for in the Purchase and Sale Agreement.

## COUNT FIVE:  PERSONAL LIABILITY OR ALTER EGO- RICHARD F. NIMS

1-42. Paragraphs 1 through 42 of the Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Five.

43.  As set forth in paragraphs 10 and 11, above, Defendant Monmouth is liable to the Plaintiff for the costs of environmental remediation which exceed the $150,000 escrow.

44.  As set forth in paragraphs 36 and 37, above, on July 19, 2000 and October 12, 2001, Defendant Nims as "President" of Monmouth Realty Company, filed applications to revive Monmouth's corporate status, and those applications were granted.

45.  On information and belief, the sole purpose of filing the applications for revival was to try to prevent any finding of personal liability against Monmouth's former shareholders, Defendants Richard F. Nims and Lois Nims.

46.  Further, as set forth in paragraph 38, above, Defendant Richard F. Nims, as "President" of Monmouth at a time when Monmouth did not exist, filed three environmental reports with MADEP relating to Monmouth's responsibility for the environmental clean-up.

47.  The first of these reports was dated February 22, 1999.  (See copy attached hereto as Exhibit O-1).  It contained the following representation:

> I attest under the pains and penalties of perjury that  .   .   . those persons(s) or entity(ies) on whose behalf this submittal is made  .   .   . has/have the technical, financial and legal ability to proceed with response actions for such site in accordance with M.G.L. c. 21E, 310 CMR 40.0000 and

other applicable requirements; and (iii) that I am fully authorized to make this attestation on behalf of the person(s) or entity(ies) legally responsible for this submittal. I/the person(s) or entity(ies) on whose behalf this submittal is made is aware of the <u>requirements in 310 CMR 40.0172 for notifying the Department in the event that I/the person(s) or entity(ies) on whose behalf this submittal is made learn(s) that it/they is/are unable to proceed with the necessary response actions</u> (emphasis added).

48. Subsequent to the dissolution of Monmouth Realty Company on December 31, 1998, Defendant Richard F. Nims - by his actions as set forth above -was acting in his personal capacity as an alter ego of Defendant Monmouth Realty Company and is, therefore, personally liable, jointly and severally with Monmouth, for the damages suffered by the Plaintiff as referred to above.

## COUNT SIX: TORTIOUS MISREPRESENTATION
## BY DEFENDANT RICHARD F. NIMS

1-42. Paragraphs 1 through 42 of Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Six.

43. As set forth in paragraphs 10 and 11, above, Defendant Monmouth is liable to the Plaintiff for the costs of environmental remediation which exceed the $150,000 escrow.

44. Further, as set forth in paragraph 38, above, Defendant Richard F. Nims, as "President" of Monmouth at a time when Monmouth did not exist, filed three environmental reports with MADEP relating to Monmouth's responsibility for the environmental clean-up.

45. The first of these reports was dated February 22, 1999. (See copy attached hereto as Exhibit O-1.) It contained the following representation:

I attest under the pains and penalties of perjury that  .   .   . those persons(s) or entity(ies) on whose behalf this submittal is made   .   .   . has/have the technical, financial and legal ability to proceed with response actions for such site in accordance with M.G.L. c. 21E, 310 CMR 40.0000 and other applicable requirements; and (iii) that I am

fully authorized to make this attestation on behalf of the person(s) or entity(ies) legally responsible for this submittal. I/the person(s) or entity(ies) on whose behalf this submittal is made is aware of the requirements in 310 CMR 40.0172 for notifying the Department in the event that I/the person(s) or entity(ies) on whose behalf this submittal is made learn(s) that it/they is/are unable to proceed with the necessary response actions (emphasis added).

46. When he made the representation set forth in paragraph 48, above, Defendant Nims was knowingly making a false statement of material fact inasmuch as he knew that all, or substantially all, of Monmouth's assets had been distributed to its shareholders and, accordingly, it did not have the "financial . . . ability to proceed with response actions" as required by the Commonwealth.

47. This representation was made with the intent that the Plaintiff rely on it. This particular report was dated only about a week after the notification to Nims by Plaintiff on February 10, 1999 (paragraph 34, above, Exhibits K and L) that "it is apparent that Monmouth Realty Company, or its shareholders, to the extent they have received distributions of Monmouth's assets, may need to indemnify us beyond the amount that has been escrowed in accordance with our written agreements."

48. The Plaintiff did in fact rely on this representation in that it induced Plaintiff to believe that Monmouth Realty or its shareholders would live up to the obligations contained in the contractual agreement it had with the Plaintiff and, for that reason, Plaintiff was willing to forbear from instituting litigation to enforce its rights. As a result, the necessary remediation work on the Premises has been long-delayed and, as of the date of this Complaint, there has been a substantial diminution in value of the property and it would probably be impossible or impossible on commercially reasonable terms to obtain financing on the property if the Plaintiff attempted to do so.

49. On information and belief, the above-described reliance and forbearance have been to the detriment of the Plaintiff in that not acting sooner may have substantially

compromised its ability to win compensation from Defendant Nims for its costs for environmental remediation and the associated costs and attorneys' fees.

## COUNT SEVEN: OPERATOR LIABILITY
## OF DEFENDANT B. D. NIMS LUMBER COMPANY
## AND OF RICHARD F. NIMS PERSONALLY

1-42. Paragraphs 1 through 42 of the Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Seven.

43. For many years prior to the Plaintiff's purchase of the property on Baldwin Street, B. D. Nims Lumber Company ("B. D. Nims") was an "operator" as that word is defined in Chapter 21E of the Massachusetts General Laws of a business located on the property.

44. In addition, however, Richard F. Nims personally performed many of the "operator" functions in that (without limitation) he:

   a. Personally owned the forklift vehicle which was used by the lumber yard and was of central importance to its operation

   b. It was he who supervised the purchase of gasoline which was delivered to the underground storage tank

   c. It was he whose office was located very proximally to the location of the tank and who could have monitored both unnecessary spillage or discharge from delivery trucks and unnecessary spillage occurring during the filling of the forklift and other lumber yard vehicles.

   d. It was he who personally arranged for and supervised release of the tank after contamination was discovered.

45. On information and belief, from some time as early as the 1950's or early 1960's until some time in 1994, there was on the property an underground storage tank which was used for the storage of gasoline for equipment and vehicles used by B. D. Nims and Richard F. Nims in the lumber business.

46. On information and belief, in addition to being the parties who installed the

17

underground tank, B. D. Nims and Richard F. Nims were at all times material herein the only users of the gasoline stored therein.

47. On information and belief - including without limitation the findings of different environmental consultants employed by both the Plaintiff and the Defendant Seller - the cause of the environmental contamination which has damaged the Plaintiff's said property was the release and/or spillage of gasoline from said tank or a gasoline pump or pumps supplied by it.

48. On information and belief, said release and/or spillage of gasoline was caused by the negligence of B. D. Nims and Richard F. Nims in that:

a. Said Defendants failed over the course of more than thirty years to monitor and control spillage from the gasoline supplier or suppliers who filled the tank on a regular basis and who, on information and belief, routinely spilled significant quantities of gasoline in the course of filling the tank and clearing the supply hose when finished.

b. Said Defendants, on information and belief, failed over the course of more than thirty years to monitor and control spillage from the gasoline pump or pumps which conveyed gasoline on a regular basis to one or more vehicles used by the Defendants in their lumber business.

c. Said Defendants, on information and belief, failed to remove the tank and any environmental contamination it may have caused within the required time period after the tank had been "abandoned" from active use as that term is defined in Chapter 21E of the Massachusetts General Laws.

49. Accordingly, B. D. Nims Lumber Company and Richard F. Nims "caused" the damages suffered and to be suffered by the Plaintiff as the word "cause" is used in Chapter 21E, Sec. 5(a)(5) of the Massachusetts General Laws, and said Defendant is therefore legally liable to the Plaintiff for the damage to said property.

## COUNT EIGHT: FRAUDULENT CONVEYANCE
## BY B.D. NIMS TO DEFENDANTS NIMS AND LOIS NIMS

1-42. Paragraphs 1 through 42 of the Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Eight.

43 - 49. Paragraphs 43 through 49 of Count Six are hereby repeated and incorporated as like-numbered paragraphs of this Count Seven.

50. In the second half of 1998 and early 1999, the Plaintiffs put the owners of B. D. Nims Lumber Company on notice that it had concerns that the environmental problems at the site would be sufficiently difficult to analyze and remediate that the funds escrowed by Monmouth in the sale and purchase arrangements would not be sufficient to pay for the remediation.

51. On December 31, 1998, Defendant B. D Nims filed dissolution papers with the Massachusetts Secretary of State.

52. In conjunction with the filing of the dissolution papers, and subsequent to receiving substantial information from the Plaintiff and ERL during the last few months of 1998 (see paragraphs 31-34, above) on the basis of which it knew or should have known that the Plaintiff could easily have a claim against it for environmental expenses in excess of the amount remaining in the environmental escrow, B. D. Nims Lumber Company distributed to its shareholders Richard F. Nims and Lois Nims what is believed to have been all or a very significant portion of its net worth.

53. This distribution was made for the purpose of defrauding the Plaintiff and hindering and preventing Plaintiff's collection of amounts due it for damages it has suffered or will suffer which were caused by Defendant B. D. Nims Lumber Company or for which it was

legally responsible.

## COUNT NINE: REIMBURSEMENT OF RESPONSE COSTS INCURRED BY PLAINTIFF

1-42. Paragraphs 1 through 42 of the Count One are hereby repeated and incorporated as like-numbered paragraphs of this Count Nine.

43 - 47. Paragraphs 43 through 47 of the Count Seven are hereby repeated and incorporated as like-numbered paragraphs of this Count Nine.

50. The Plaintiff is, for the reasons set forth above, entitled to reimbursement of the entirety of its response costs for clean-up of the contamination described from the Defendant B. D. Nims Lumber Company in accordance with Chapter 21E, Sec. 4 of the Massachusetts General Laws

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, Avon Wholesale Supply, Inc., requests that the Court:

a. Enter judgment against the defendants on all counts of this Complaint;

b. Award the Plaintiff its actual damages;

c. Order that the Defendants Richard F. Nims and Lois Nims convey back to Defendant Monmouth Realty Company the full amounts of all distributions of assets, cash or cash equivalents received by them from Monmouth

d. Impose a constructive trust on Defendant Richard F. Nims in a monetary amount equal to what he received as a result of the fraudulent conveyance to him by B. D. Nims Lumber Company as alleged in Counts Four and Eight, and order that amount paid to the Plaintiff

e. Impose a constructive trust on Defendant Lois Nims in a monetary amount equal to what she received as a result of the fraudulent conveyance to her by B. D. Nims Lumber Company as alleged in Counts Four and Eight, and order that amount paid to the Plaintiffs.

f. Award the plaintiffs all appropriate costs, attorneys' fees, expenses and interest authorized by law; and

g. Award the plaintiffs such other relief as is deemed just and appropriate.

## THE PLAINTIFF DEMANDS A JURY TRIAL

### PLAINTIFF

### AVON WHOLESALE SUPPLY, INC.

BY _____
David J. Wenc Esq., Its Attorney

Bar #549400
734 Bliss Road, Suite 1-A
Longmeadow  MA 01106

BY _____

C. Thomas Furniss, Its Attorney

Fed Bar #ct00028
Furniss & Quinn P.C.
248 Hudson St.
Hartford CT 06106

(860) 527-2245

f. Award the plaintiffs all appropriate costs, attorneys' fees, expenses and interest authorized by law; and

g. Award the plaintiffs such other relief as is deemed just and appropriate.

## THE PLAINTIFF DEMANDS A JURY TRIAL

**PLAINTIFF**

**AVON WHOLESALE SUPPLY, INC.**

BY _____
  David J. Wenc Esq., Its Attorney

  Bar #549400
  734 Bliss Road, Suite 1-A
  Longmeadow  MA 01106

BY _____

  C. Thomas Furniss, Its Attorney

  Fed Bar #ct00028
  Furniss & Quinn P.C.
  248 Hudson St.
  Hartford CT 06106

  (860) 527-2245

21

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.